# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

JAMES LACKEY,              )
                              )
       Petitioner,         )
                              )
v.                          )      NO. 2:19-cv-00096
                              )
JASON CLENDENION, Warden,[1]  )
                              )
       Respondent.       )

## <u>MEMORANDUM OPINION</u>

James Lackey, an inmate at the Turney Center Industrial Complex in Clifton, Tennessee, is serving a twenty-two year prison sentence based on his 2014 conviction by a White County, Tennessee jury of one count of second-degree murder. On December 5, 2019, Petitioner filed a pro se Petition for the Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. No. 1), challenging the constitutionality of his state conviction. In response, Respondent filed the transcript of proceedings in state court (Doc. No. 9) and an Answer to the Petition (Doc. No. 11). Petitioner subsequently filed a Reply to Respondent's Answer. (Doc. No. 14).

This matter is fully briefed and ripe for the Court's review, and the Court has jurisdiction. Respondent does not dispute that the Petition is timely and that this is Petitioner's first Section 2254 petition related to this conviction. (Doc. No. 11 at 2). Having reviewed Petitioner's arguments and the underlying record, the Court finds that an evidentiary hearing is not required.

---

[1] On March 4, 2022, Petitioner notified the Court of his recent transfer from the South Central Correctional Facility (SCCF) to the Turney Center Industrial Complex, where Mr. Jason Clendenion is Warden. (Doc. No. 17). As the proper respondent to a petition under Section 2254 is the warden of the institution where the petitioner is in custody, <u>Rumsfeld v. Padilla</u>, 542 U.S. 426, 434 (2004) (citing 28 U.S.C. §§ 2242, 2243), the proper respondent here is Warden Jason Clendenion, rather than SCCF Warden Grady Perry. In the Order accompanying this Memorandum Opinion, the Clerk will be directed to make this change on the docket.

As explained below, Petitioner is not entitled to relief under Section 2254, and his Petition will therefore be denied.

# I. PROCEDURAL HISTORY

After being indicted on a charge of first-degree murder, Petitioner was convicted of the lesser included offense of second-degree murder on January 14, 2014. He was sentenced to serve twenty-two years in prison on April 7, 2014. (Doc. No. 9-1 at 84).

The Tennessee Court of Criminal Appeals affirmed the trial court's judgment on direct appeal. State v. Lackey, No. M2015-01508-CCA-R3-CD, 2016 WL 4055709 (Tenn. Crim. App. July 27, 2016); (Doc. No. 9-14). The Tennessee Supreme Court denied discretionary review on October 20, 2016. (Doc. No. 9-16).

Petitioner subsequently filed for post-conviction relief in the trial court, where an evidentiary hearing was held on January 4, 2018. (Doc. No. 9-18). The post-conviction trial court denied relief on January 29, 2018. (Doc. No. 9-17 at 94–103). On February 19, 2019, the Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. Lackey v. State, No. M2018-00230-CCA-R3-PC, 2019 WL 669759 (Tenn. Crim. App. Feb. 19, 2019); (Doc. No. 9-23). Petitioner was denied permission to appeal to the Tennessee Supreme Court on July 18, 2019. (Doc. No. 9-25). Five months later, Petitioner filed his pro se petition under Section 2254 in this Court.

# II. STATEMENT OF FACTS

A.    Evidence at Trial

Bedford County Sheriff's Deputy Steven Daugherty testified that at around 1:30 a.m. on February 23, 2012, he received a phone call from Petitioner, whom he had known for approximately six months through their mutual interest in working on Jeeps. Daugherty testified

that Petitioner's voice was shaking when he asked Daugherty for help, stating that he had shot someone and needed help contacting the FBI. Daugherty contacted his supervisor and instructed Petitioner to meet him at the Bedford County Sheriff's Office (BCSO). When Petitioner arrived, he had a gun in the front passenger seat of his vehicle. Petitioner could not provide the address of the residence where the shooting took place, but Daugherty was able to ascertain that it took place in White County, and Petitioner confirmed that the victim was deceased. State v. Lackey, 2016 WL 4055709, at *1.

Petitioner subsequently confessed to the fatal shooting in a statement given to Agent Larry Davis of the Tennessee Bureau of Investigation (TBI), who had been dispatched to the BCSO to assist county law enforcement. In his statement, Petitioner revealed that he had been at the victim's home in Warren County several weeks earlier because Petitioner's brother, Tommy Lackey,[2] lived with the victim and needed assistance with a repair. About twenty minutes after Petitioner arrived to assist Tommy, the TBI arrived at the house. The TBI searched the victim's home and discovered methamphetamine and marijuana, though they ultimately left without confiscating all the drugs or arresting anyone. Petitioner stated that he met with the victim several times after this TBI raid, because he was concerned about Tommy and suspicious as to why the TBI left without seizing the drugs or arresting anyone. On one occasion when Petitioner was at the residence visiting Tommy, the victim arrived home and an angry encounter ensued. Petitioner admitted that this encounter ended with him pulling a gun on the victim, who he believed had labeled him a snitch responsible for the TBI's raid. After this encounter, Petitioner did not see the victim for about a week, until February 22, 2012, when Tommy called to tell him that the victim wanted to talk to him. State v. Lackey, 2016 WL 4055709, at *1–2.

---

[2] Because Tommy Lackey shares a last name with Petitioner and is repeatedly referenced in this Memorandum Opinion, the Court will largely refer to him using only his first name, Tommy.

According to the decision of the Tennessee Court of Criminal Appeals, the following events were then described in Petitioner's statement to Agent Davis:

> Tommy told the [Petitioner] where the victim was staying, and the [Petitioner] drove from his mother's house in Manchester to the house where the victim was staying in White County, arriving around 12:00 a.m. The [Petitioner] said that Tommy had been at the house earlier but was gone by the time he arrived. According to the [Petitioner], he "was real cautious" when he went to see the victim that night because he had been told that the victim and his family would "have snipers shoot him and all kinds of stuff." The [Petitioner] told Agent Davis "it was just a matter of time before somebody was killed," and he knew he had "a target" on his back.
>
> The [Petitioner] said that the door to the house was open, and he let himself in, telling Agent Davis that the victim's "leg was bad," so he did not expect him to answer the door. After entering the house, the [Petitioner] called out to let the victim know he had arrived, and the victim said he was in the back. The [Petitioner] went to a bedroom in the back of the house, where he found the victim who was sitting on the bed. The [Petitioner] claimed he was "pretty nervous" and said that "it was just like [the victim] had it planned out for [the Petitioner] to come up there." The victim lit a cigarette, and then, according to the [Petitioner], the victim reached for a gun with his left hand from the "side of the bed." The [Petitioner] said that his [own] gun was in a holster on his hip, which he took out as soon as he thought he saw the victim reach for his gun. According to the [Petitioner], "before [the victim] ever got a chance to point at [him], [the Petitioner] fired." The [Petitioner] shot the victim in his chest, and the victim fell back on the bed. The [Petitioner] claimed that the victim sat back up and pointed a gun at him, and the [Petitioner] fired a second shot, hitting the victim in his head. He estimated that he was eight to ten feet from the victim when he fired the shots.
>
> The [Petitioner] said that he checked the victim's pulse and then left the house immediately because the victim had "kinfolk" nearby, and the [Petitioner] was worried that someone might have heard the gunshots and would come after him. He estimated that he was in the house for a total of five minutes. The [Petitioner] said that he did not see where the victim's gun was and did not look for it after shooting him. After leaving, the [Petitioner] called Tommy and instructed him to stay away from the house. . . .

Id. at *2.

The lead WCSO investigator on the case, Detective Chris Isom, testified that the victim's bedroom was well lit and that two shell casings were recovered from the room, though not from locations consistent with Petitioner's statement to the TBI about the distances and angles from

4

which he had fired the shots. Detective Isom also testified that the victim had a cell phone on his belt, on his right side. TBI Agent Dan Friel assisted Detective Isom with the investigation and also testified that Petitioner's statement was inconsistent with the location of the shell casings. Agent Friel identified a text message sent from Petitioner's cell phone to Tommy's cell phone the day prior to the shooting, which read: "tell [the victim] he can run but he cnt hide for lng i will be seeing yall in a few hes got yall fooled but not me hes a low life pos." Id. at *3, 4.

Dr. Adele Lewis, the forensic pathologist who performed the victim's autopsy, provided expert testimony which the Tennessee Court of Criminal Appeals summarized as follows:

> Dr. Lewis testified that the victim sustained two gunshot wounds. One wound was to the "middle part of his chest" and the other was to the right side of his head near his ear. According to Dr. Lewis, the bullet that entered the chest hit the aorta and left lung. She opined that this injury would have very likely been fatal. She further opined that it was very unlikely that someone with this type of injury would be able to sit up. She said that this bullet traveled from front to back and downward, which was consistent with the shooter standing over the victim. The bullet that entered the victim's head entered below the right ear and traveled through the brain stem and exited the left side of the head. According to Dr. Lewis, the trajectory of this bullet went from behind the ear and up through the victim's head. Dr. Lewis said that it was "very unlikely" and "not physically possible" for the bullet to have been fired downward. Rather, she opined that it was more likely that the victim was lying down when the bullet entered his head. Dr. Lewis testified that the gun was fired from an indeterminate range but was at least three feet away.

Id. at *4.

Petitioner testified in his own defense, stating that he went to the victim's residence in White County—despite fearing that the victim was attempting to lure him there to kill him— because he thought the victim needed his help, "surmising that the victim 'was suicidal probably and homicidal.'" Id. at 5. He testified that when he entered the victim's bedroom, the victim pulled from his left side a gun that "looked like a [.]380 or a sub-compact Glock." Id. "Upon seeing this, the [Petitioner] drew his gun and fired at the victim; he waited 'a couple seconds' and then fired again. The [Petitioner] estimated that he was six feet away from the victim when he fired the first

shot and that he took a step backward before firing the second shot. The [Petitioner] checked the victim's pulse after the second shot and then left." Id. Petitioner testified that he did not turn himself in to White County authorities because he did not trust those authorities or the victim's family. Id.

Although Tommy Lackey was subpoenaed by the State to testify at Petitioner's trial, he failed to appear. He also failed to appear in response to a subpoena to testify at Petitioner's post-conviction evidentiary hearing, forcing the state court to reschedule the hearing and issue an attachment and bond to secure Tommy's presence and testimony at the rescheduled hearing. (Doc. No. 9-17 at 90, 92; Doc. No. 9-18 at 19, 103).

B.    Post-Conviction Proceedings

The following summary of the testimony at the post-conviction evidentiary hearing, as relevant to the issues raised in this habeas action, is taken from the opinion of the Tennessee Court of Criminal Appeals affirming the denial of post-conviction relief:

> Trial counsel said he and the Petitioner discussed potential witnesses, including Tommy Lackey, the Petitioner's brother; Wanda Lackey, the Petitioner's mother; and Angela Lackey Garcia, the Petitioner's sister. However, trial counsel asserted that the Petitioner "didn't have anybody that was going to help him that would have made any difference" and that the potential witnesses they discussed did not have "anything to add." He explained, "I'm dealing with a client who confessed, full confession, turned over the murder weapon. And so the strategy at trial was, okay, yes, you did it, why did you do it. And so the most key witness in this whole thing was [the Petitioner]." Trial counsel clarified that in light of the Petitioner's confession to the crime, the "defense was either murder by mistake or self[-]defense." Consequently, he said the Petitioner understood that he was the key witness in this case and that it would be beneficial for him to testify in his own behalf. . . .
>
> Trial counsel stated that he and his investigator searched for Tommy Lackey in several different states and that neither he nor the State was successful in locating him. He noted that he made several attempts to find Tommy Lackey at different points during his representation of the Petitioner, including approximately thirty days prior to trial, but all of these attempts were unsuccessful. Nevertheless, trial counsel maintained that Tommy Lackey's potential testimony was unreliable and "didn't help us at all," explaining,

6

Tommy Lackey . . . allegedly gave a statement, whether it's true or not I don't know, that he had gone up [to the victim's trailer] at some point in time after the murder and taken out a rifle. Nobody ever sa[id] a rifle, nobody has ever seen a rifle, I don't even think that was true, I don't even think that he went to the murder scene. . . . [T]hat just didn't make any [sense], you know to have somebody try to clean up a crime scene, . . . that's what it sounded like, [and] I wasn't going to put that in front of a jury, that would be crazy.

Trial counsel said that because Tommy Lackey's potential testimony was not going to be helpful and because neither he nor the State could find him to clarify his testimony, he informed the Petitioner that he did not intend to call Tommy Lackey at trial. Although trial counsel knew that Tommy Lackey had also spoken with the public defender's investigator, he claimed that the statement did not contain anything helpful to the Petitioner. Trial counsel said he never asked for a continuance for the purpose of finding Tommy Lackey because he did not believe that he was a necessary witness at trial.

Although trial counsel chose not to subpoena Tommy Lackey, the State subpoenaed him. When Tommy Lackey failed to appear at trial, the State made a motion in limine to prevent the defense from eliciting hearsay evidence from statements made by Tommy Lackey, and trial counsel immediately requested a missing witness instruction, stating, "I didn't think [Tommy Lackey] had anything positive to say, but you know, you want to put that question to the jury[. T]he [S]tate didn't bring him[,] and they subpoenaed him[,] and you argue that. Good trial strategy." When arguing for the missing witness instruction, trial counsel asserted that Tommy Lackey was a potentially exculpatory witness even though trial counsel "had no idea what [Tommy Lackey] was going to say" and "could have said anything." He said Tommy Lackey's "only statement was he went and took a rifle . . . off the crime scene," but the Petitioner "never said that he saw a rifle." Instead, the Petitioner said he "thought [the victim] had a pistol in his hand" when the victim "in fact . . . had a cell phone in his hand [at the time he was shot]."

                . . .

Trial counsel said that he had prepared a subpoena for Tommy Lackey and would have filed it if he had been able to obtain an address for him. He noted that because the State had filed a subpoena for Tommy Lackey, he made a tactical decision to argue for the missing witness instruction at trial, even though the trial court declined to give it. When asked why he did not make an offer of proof regarding his efforts to find Tommy Lackey, trial counsel said that he recalled telling the court that he had looked for Tommy Lackey but was unable to find him.

Trial counsel noted that although he characterized Tommy Lackey as a "potentially exculpatory" witness when arguing for the missing witness instruction, he "didn't

trust that [Tommy Lackey's] testimony actually would really help us." He said he made the "tactical decision" not to call Tommy Lackey, regardless of his unavailability, because he "wasn't a hundred percent sure he was actually exculpatory." He added that he only made the argument that Tommy Lackey was a potentially exculpatory witness with the hope that he would receive a missing witness instruction at the Petitioner's trial.

On cross-examination, trial counsel said that his discussions with the Petitioner made it clear that the Petitioner had shot the victim, that the Petitioner had provided the murder weapon to the police, and that the Petitioner had been the only person at the victim's residence at the time of the shooting. He said he discussed the Petitioner's trial testimony with him "[m]ultiple times[,]" that the Petitioner voluntarily chose to testify, and that the Petitioner was not "pressured" to testify due to Tommy Lackey's unavailability. The Petitioner's Right to Testify at Trial form was admitted into evidence without objection.

Although his conversations with the Petitioner made clear that Tommy Lackey was not present during the shooting, trial counsel said the Petitioner still "wanted to blame Tommy Lackey for the murder or [claim] that maybe Tommy Lackey had done it, but there was no proof, there was no hint, there was no evidence that would lead that direction." Trial counsel said he and the Petitioner discussed the fact that, if he could be located, Tommy Lackey's testimony might be detrimental to the Petitioner's case. They specifically discussed the fact that Tommy Lackey's original statement to the TBI was "that Tommy Lackey traveled to [the victim]'s camper after [the Petitioner] murdered [the victim] and when he got back to the trailer, there was no gun close to [the victim], no handgun close to [the victim], only a rifle wrapped in cloth in the corner of that trailer[.]" Trial counsel stated that Tommy Lackey's statement to the TBI made it difficult for the Petitioner to take the stand and assert that the victim had a pistol in his hand when he shot him. Trial counsel also noted that when law enforcement officers searched the victim's trailer, they did not find a pistol but did find a cell phone on the victim's person. Trial counsel explained,

> [Y]ou can mistake a cell phone for a pistol perhaps in the dark, gloomy, scar[y] place. You can't mistake a cell phone for a rifle. And so having a rifle in [the victim's trailer] . . . surely didn't help [the Petitioner]. And that's my thinking and my strategy . . . who cares if there was a rifle, I'm glad there's no testimony there was a rifle in the room. It makes more sense in our defense that [the Petitioner] made a mistake [in thinking that the victim's cell phone was a pistol].

Trial counsel said that he made the strategic decision not to call Tommy Lackey as a witness at trial because he believed that Lackey's testimony might be "detrimental" to the Petitioner's case. He also mentioned that because the State's resources were better than his, if the State was unable to find Tommy Lackey, then he would have been unable to locate him.

Trial counsel said he and the Petitioner discussed his concerns about calling Tommy Lackey as a witness at trial, which included: "I can't find [Tommy Lackey], I don't know what he's going to say, there's no guarantee that he doesn't come in and throw you under the bus. . . . [S]hort of coming in and confessing he was the murderer, I'm not sure what [Tommy Lackey] could have offered that would have really helped." Trial counsel reiterated that he made a tactical decision not to call Tommy Lackey and said that the Petitioner himself had reservations about calling Tommy Lackey as a witness at trial. He also remembered the Petitioner's saying that he did not want his brother, Tommy Lackey, involved in the case because "he was wanting to protect him to some degree" and did not want him to get in trouble for perhaps "tamper[ing] with the crime scene or something like that."

Tommy Lackey, the Petitioner's brother, testified at the post-conviction hearing that he had been friends with the victim for ten years at the time of the victim's death and had lived on the victim's property in 2013. He recalled speaking with TBI officers but could not remember what he said to them. He did not recall telling the TBI that the victim had a dark side and could "flip out" sometimes. Portions of Tommy Lackey's recorded TBI interview were played during his testimony at the post-conviction hearing to refresh his recollection. At first, Tommy Lackey refused to confirm that it was his voice on the recording. Although he initially asserted that this recording could have been "edited [or] manipulated[,]" he eventually admitted that it was his voice on the recording.

Tommy Lackey recalled telling the TBI officers that the victim thought that the Petitioner was responsible for "an earlier [drug] raid on him[,]" which caused "some conflict . . . between the two of them." He also remembered telling the officers that he did not feel safe on the victim's property. The night of the shooting, the victim asked Tommy Lackey to run an errand to pick someone up, which Tommy Lackey characterized as "a little odd . . . [b]ecause there wasn't nobody there when I got there." He said he told the officers that the victim waited for the Petitioner to arrive while he was gone on this errand.

Tommy Lackey confirmed that he turned over a rifle, not a handgun, [to] the TBI at the time of his interview. He asserted that this rifle remained in the trunk of his car and was "[n]ot taken from the residence of [the victim]" on the night the victim was shot. He added that "the only time [this rifle] was on [the victim's] property was [when it was] in my possession" and said that he did not recall telling the TBI officers that he had hidden this rifle on the victim's property. While he admitted telling the TBI officers that he had removed a rifle from the murder scene, Tommy Lackey asserted at the post-conviction hearing that he never removed a rifle from the victim's trailer and did not recall telling the police that he found a rifle there.

On cross-examination, Tommy Lackey confirmed that the Petitioner knew that the victim was alone when he entered the victim's trailer the night of the shooting. He said that after leaving the victim's trailer to run the errand, he talked to the Petitioner

and discussed the fact that he was no longer on the victim's property and that the victim was alone in his trailer. Tommy Lackey said that before he returned to the victim's property, he received a call from the Petitioner, during which the Petitioner told him "things had went bad[.]" Tommy Lackey confirmed that he had no personal knowledge of what happened between the Petitioner and the victim at the trailer that night. He also confirmed that he did not return to the victim's trailer that night. Tommy Lackey acknowledged that the Petitioner and the victim had been having problems with one another and that the Petitioner had previously made statements that the victim could run but could not hide.

During redirect examination, post-conviction counsel asked for Tommy Lackey's recorded TBI interview to be admitted into evidence, given that Lackey had identified those statements as his own, and the State objected on the basis of hearsay. Ultimately, the trial court admitted the recording but asserted that it was only going to consider Tommy Lackey's testimony at the post-conviction hearing as substantive evidence in determining whether to grant post-conviction relief. . . .

The Petitioner also testified at the post-conviction hearing. . . . The Petitioner said trial counsel discussed potential witnesses with him and told him that his brother, Tommy Lackey, and his sister, Angela Garcia, would be called as witnesses at trial. The Petitioner said he believed that Tommy Lackey's testimony was helpful to his defense.

The Petitioner did not remember trial counsel's having any problems locating Tommy Lackey. He was not aware that trial counsel had hired an investigator in his case and asserted that he had never met with an investigator. He asked trial counsel to hire the public defender's investigator because she had taken a statement from Tommy Lackey, but trial counsel refused.

The Petitioner said he first realized that Tommy Lackey and Angela Garcia would not be testifying for the defense when he arrived at trial. Previously, trial counsel had told him he had issued a subpoena to Tommy Lackey. However, when he arrived at trial, trial counsel told him that the State had subpoenaed Tommy Lackey and that Tommy had failed to appear. He said trial counsel claimed that Tommy Lackey's failure to appear at trial would not be detrimental because they could make the Petitioner's case without him.

On cross-examination, the Petitioner denied discussing the problems with Tommy Lackey's testimony with trial counsel. Instead, he claimed that Tommy Lackey's testimony, in light of statement he gave to the TBI, would have helped his case. The Petitioner also denied reviewing the right to testify form with trial counsel. Although he told the court he had read and understood this form, he claimed he had not actually read it and instead "agreed [to] whatever it t[ook] for [him] to testify[.]" The Petitioner acknowledged that the trial transcript reflected his statements that trial counsel had prepared him to testify at trial and that they had discussed the potential benefits and consequences of testifying.

The Petitioner acknowledged that he shot the victim and that it was never a part of his defense strategy to contend otherwise. However, he said he lied at trial about firing the second shot at the victim and told this lie only because he was precluded from testifying about his brother's involvement in the offense. The Petitioner claimed that he testified in his own behalf only because trial counsel told him to testify and that if it had been his choice, he never would have testified.

Lackey v. State, 2019 WL 669759, at *2–6.

### III. CLAIMS PRESENTED FOR REVIEW

The pro se Petition in this Court asserts the following claims:

(1)     Trial counsel rendered ineffective assistance when he failed to call an exculpatory witness, Tommy Lackey, and instead argued for a "missing witness" jury instruction.

(2)     The Tennessee Court of Criminal Appeals made an unreasonable factual determination when it ruled that the post-conviction trial court properly exercised its discretion in deciding to admit, but not consider as substantive evidence, Tommy Lackey's recorded interview with the TBI.

(Doc. No. 1 at 4–6; see also Doc. No. 14 at 2–6).

### IV. LEGAL STANDARD

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Peterson v. Warren, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and

federalism.'" Woodford v. Garceau, 538 U.S. 202, 206 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." Uttecht v. Brown, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102–03 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams v. Taylor, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (d)(2). A state court's legal decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A state court decision is not unreasonable under this standard simply because the federal court finds

12

it erroneous or incorrect. <u>Id.</u> at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. <u>Id.</u> at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination; rather, the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings." <u>Young v. Hofbauer</u>, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." <u>Matthews v. Ishee</u>, 486 F.3d 883, 889 (6th Cir. 2007) (quoting Section 2254(d)(2) and (e)(1)); <u>but see</u> <u>McMullan v. Booker</u>, 761 F.3d 662, 670 & n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read <u>Matthews</u> to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under Section 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." <u>Rice v. White</u>, 660 F.3d 242, 250 (6th Cir. 2011).

The standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011) (quoting <u>Richter</u>, 562 U.S. at 102, and <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24 (2002) (per curiam)). The petitioner bears the burden of proof. <u>Pinholster</u>, 563 U.S. at 181.

Even that demanding review, however, is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system. A federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. Pinholster, 563 U.S. at 182; Kelly v. Lazaroff, 846 F.3d 819, 828 (6th Cir. 2017) (quoting Wagner v. Smith, 581 F.3d 410, 417 (6th Cir. 2009)) (petitioner must present the "same claim under the same theory" to the state court). This rule has been interpreted by the Supreme Court as one of total exhaustion, Rose v. Lundy, 455 U.S. 509 (1982), meaning that each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. Picard v. Connor, 404 U.S. 270 (1971); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. Gray v. Netherland, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. See Edwards v. Carpenter, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 81–82 (1977); see also Walker v. Martin, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); Coleman v. Thompson, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when

an applicable statute of limitations bars a claim or state law deems the claim waived),[3] then the claim is technically exhausted, but procedurally barred. <u>Coleman</u>, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Id.</u> at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. <u>Lucas v. O'Dea</u>, 179 F.3d 412, 418 (6th Cir. 1999) (citing <u>Coleman</u>, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[;] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." <u>Coleman</u>, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." <u>Id.</u> To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." <u>Perkins v. LeCureux</u>, 58 F.3d 214, 219 (6th Cir. 1995) (quoting <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982)); <u>see also</u> <u>Ambrose v. Booker</u>, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of

---

[3] The Tennessee Post-Conviction Procedure Act provides that "[i]n no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment," and establishes a one-year statute of limitations for filing that one petition. Tenn. Code Ann. § 40-30-102(a) and (c). The Act further provides that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented," unless that ground could not be presented due to unconstitutional state action, or is based on a new and retroactive constitutional right that was not recognized at the time of trial. <u>Id.</u> § 40-30-106(g).

Case 2:19-cv-00096   Document 18   Filed 03/10/22   Page 15 of 23 PageID #: 1441

prejudice." Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. Dretke v. Haley, 541 U.S. 386, 392 (2004) (citing Murray v. Carrier, 477 U.S. 478, 495–96 (1986)); accord Lundgren v. Mitchell, 440 F.3d 754, 764 (6th Cir. 2006).

## V. ANALYSIS

Petitioner asserts two claims to habeas relief, each related to the testimony (or lack thereof) of Tommy Lackey, albeit at different stages of the state-court proceedings. First, Petitioner claims that trial counsel failed to render constitutionally effective assistance when, in relation to Tommy's potential trial testimony, counsel "failed to call [this] exculpatory witness for the defense and instead relied on a missing witness charge." (Doc. No. 1 at 4). Petitioner argues that counsel should have sought a continuance when the State failed to secure Tommy's attendance at trial, particularly in light of counsel's subsequent argument that a missing witness instruction was appropriate because Tommy was an "exculpatory witness" whose testimony would have helped Petitioner's case. (Doc. No. 14 at 2). Second, Petitioner claims that the state courts unreasonably excluded the source of Tommy's anticipated trial testimony—his responses during a recorded interview with the TBI—from substantive consideration on state post-conviction review. (Doc. No. 1 at 6; Doc. No. 14 at 3–6).

A.     <u>Ineffective Assistance of Counsel</u>

Federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing Petitioner; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive Petitioner of a fair trial. <u>Id.</u> at 687. To meet the first prong, Petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [he] must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" <u>Id.</u> at 688–89. The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372 (1993). Prejudice, under <u>Strickland</u>, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>

Petitioner properly exhausted his claim that counsel was ineffective in failing to arrange for Tommy Lackey to testify at trial, and resorting to seeking a missing witness jury instruction when Tommy failed to appear in response to the State's subpoena. The Tennessee Court of Criminal Appeals denied post-conviction relief on this claim, as follows:

> Here, the record shows that trial counsel made adequate efforts to contact and locate Tommy Lackey, to no avail. Trial counsel testified at the post-conviction hearing that he made several attempts to locate Tommy Lackey in multiple states but that neither he nor the State could find him. Trial counsel also said that when he characterized Tommy Lackey's potential testimony as "exculpatory" when arguing for the missing witness instruction at trial, he did not know the substance of Tommy Lackey's testimony, was just "throwing things against the wall just to see what

sticks[,]" and did not believe this testimony would have proven beneficial to the Petitioner's defense.

At the conclusion of the hearing, the post-conviction court noted that the Petitioner failed to show how Tommy Lackey's testifying at trial "would have changed the outcome of this case." Moreover, in its order denying relief, the post-conviction court concluded that Tommy Lackey's testimony "would not have supported a defense" and "could have been detrimental to the Petitioner had he testified at trial." Although the Petitioner characterizes Tommy Lackey's potential trial testimony as "exculpatory," the Petitioner has failed to show what specific testimony Tommy Lackey would have provided that would have exculpated the Petitioner and changed the outcome at trial. Moreover, when considering whether trial counsel's failure to call Tommy Lackey prejudiced the Petitioner, we recognize that the Petitioner was convicted not of first[-]degree murder as charged, but of the lesser included offense of second[-]degree murder. For all of these reasons, we agree with the post-conviction court that the Petitioner failed to establish that trial counsel's performance was deficient or that he was prejudiced by any alleged deficiency. Accordingly, the Petitioner is not entitled to relief on this issue.

Lackey v. State, 2019 WL 669759, at *8.

As previously discussed, a federal court may not grant habeas relief on a claim that has been rejected on the merits by a state court, unless the petitioner shows that the state court's decision "was contrary to" law clearly established by the United States Supreme Court, that it "involved an unreasonable application of" such law, or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. §§ 2254(d)(1) and (2); Williams v. Taylor, 529 U.S. 362, 412 (2000). Thus, when an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Harrington v. Richter, 562 U.S. at 101. As the Supreme Court clarified in Harrington,

This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of

18

§ 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.

<u>Id.</u> (internal quotation marks and citation omitted).

The Court of Criminal Appeals properly decided this issue under <u>Strickland</u>. <u>See</u> <u>Lackey</u>, 2019 WL 669759, at *8 (quoting <u>Strickland</u> and state cases applying its two-prong test). First, the appellate court appropriately relied on counsel's testimony, credited by the post-conviction court, that he enlisted an investigator to search for Tommy in "multiple states" to no avail, and that the State also failed to locate him despite the issuance of a trial subpoena. <u>Id.</u> at *7–8. Because Tommy could not be located and counsel did not know the substance of his potential testimony, the Court of Criminal Appeals reasonably found that counsel did not render deficient performance in failing to present Tommy as a trial witness, particularly given Petitioner's failure "to show what specific testimony Tommy Lackey would have provided that would have exculpated the Petitioner." <u>Id.</u>

Next, the Court of Criminal Appeals found that Petitioner had not shown that he was prejudiced by counsel's failure to procure Tommy's testimony. The appellate court agreed with the post-conviction court's conclusions from the testimony it received, that Tommy "'would not have supported a defense' and 'could have been detrimental to the Petitioner had he testified at trial,'" particularly since a record lacking the testimony of this witness subpoenaed by the State led the jury to find that the State had failed to prove first-degree murder. <u>Id.</u> Petitioner argues that, regardless of Tommy's post-conviction testimony, his statement to the TBI and tendering of a .22-caliber rifle to that agency should have led the state courts to find that the failure to secure him as a trial witness was prejudicial. (<u>See</u> Doc. No. 14 at 3). But counsel testified at the post-conviction evidentiary hearing that Tommy's identification and production of a rifle was at odds with the defense theory that Petitioner acted in self-defense, based on his mistaken belief that the victim's

cell phone was a pistol. See Lackey, 2019 WL 669759, at *3–4; (Doc. No. 9-17 at 100). The state courts thus found not only that Petitioner was not prejudiced by Tommy's absence from the trial, but that Tommy's statements and testimony could easily have been detrimental to Petitioner. Id. at *8; (Doc. No. 9-17 at 101).

These findings of no deficient performance or prejudice are not unreasonable, and the Court of Criminal Appeals did not unreasonably apply Strickland to arrive at them. Accordingly, Petitioner is not entitled to habeas relief on this claim.

B.     Failure of Post-Conviction Court to Give Substantive Consideration to Tommy Lackey's Recorded Interview

Petitioner's second habeas claim is that "[t]he Tennessee Court of Criminal Appeals made an unreasonable determination of the facts by ruling that the Post-Conviction Court did not abuse its discretion in failing to consider Tommy Lackey's recorded interview as substantive evidence." (Doc. No. 1 at 6). Though this claim is framed under the "unreasonable determination of the facts" standard of Section 2254(d)(2), the Court liberally construes it as an attack on the underlying legal ruling that excluded the substance of Tommy's statement to the TBI from the determination of whether Petitioner was entitled to post-conviction relief. (See Doc. No. 14 at 6) ("Petitioner avers that the State Court's ruling on the exclusion of Tommy Lackey's recorded statement to the TBI as substantive evidence was a denial of Petitioner's due process rights under the United States Constitution[.]"). While Petitioner contends that the post-conviction court abused its discretion "when it failed to consider the materiality" of Tommy's interview statements (Doc. No. 1 at 6), the Court of Criminal Appeals "conclude[d] that the post-conviction court properly admitted Tommy Lackey's post-conviction testimony, rather than his recorded TBI interview, as substantive evidence" under the applicable Tennessee Rules of Evidence, explaining as follows:

The record shows that Tommy Lackey's recorded interview was repeatedly used on direct examination during the post-conviction hearing to refresh his recollection. After the State concluded its cross-examination of Tommy Lackey, post-conviction counsel asked that Lackey's recorded interview be admitted as substantive evidence. The State objected on the basis of hearsay. Thereafter, the post-conviction court admitted the recorded interview, consistent with [Tennessee Rule of Evidence] 612, for purposes of appellate review. The court stated that it would only consider Tommy Lackey's post-conviction testimony as substantive evidence, explaining, "Mr. Tommy Lackey is under oath to testify truthfully today. . . . He did not go back to the trailer. He [did not have] in his possession a pistol, that he had a rifle, [and] that it was in his trunk[.]"

In making this ruling, the post-conviction court expressly accredited Tommy Lackey's post-conviction testimony over the statements he made in his recorded TBI interview and implicitly held that Lackey's recorded interview was inadmissible hearsay. The court also discredited the Petitioner's post-conviction testimony, based on his numerous admissions that he lied at trial, and accredited the trial counsel's and Tommy Lackey's post-conviction testimony over the Petitioner's testimony. The court then concluded, after reviewing all the evidence presented at the post-conviction hearing, that the Petitioner was not entitled to relief. Because the Petitioner has failed to show how the post-conviction court erred in failing to consider Tommy Lackey's recorded interview as substantive evidence, he is not entitled to relief.

Lackey, 2019 WL 669759, at *9–10.

Respondent argues that Petitioner's claim is not cognizable in federal habeas because it asserts a mere error in application of the state law governing admissibility of evidence. (See Doc. No. 11 at 11) (citing, e.g., Walker v. Engle, 703 F.2d 959, 962 (6th Cir. 1983) ("errors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus")). However, more fundamentally, this claim is not cognizable because it asserts an error in state post-conviction proceedings rather than the proceedings in which Petitioner was convicted and sentenced. Claims of error committed during state post-conviction proceedings are not cognizable under 28 U.S.C. § 2254, which provides relief to "a person in custody pursuant to the judgment of a State court *only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States," id. § 2254(a) (emphasis

added), not on grounds that his rights were violated in proceedings collateral to the judgment imposing custody. See Kirby v. Dutton, 794 F.2d 245, 247 (6th Cir. 1986) (holding that, "[t]hough the ultimate goal in [the] case . . . is release from confinement," petitioner's claims of constitutional violations in state post-conviction proceedings are in the "second tier of complaints" that do not "directly dispute the fact or duration of the confinement," and therefore are not cognizable in federal habeas)); see also Alley v. Bell, 307 F.3d 380, 387 (6th Cir. 2002). Accordingly, the Court cannot entertain Petitioner's claim that the post-conviction court's evidentiary ruling was unconstitutional.

## VI. CONCLUSION

For the reasons given above, the Petition for Writ of Habeas Corpus (Doc. No. 1) will be denied and this matter will be dismissed with prejudice.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a Section 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. A petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (citations and internal quotation marks omitted). "[A] COA does not require a showing that the appeal will succeed," but courts should not issue a COA as a matter of course. Id. at 337.

Because reasonable jurists could not debate whether the Petitioner's claims should have been resolved differently or deserve encouragement to proceed further, the Court will deny a COA.

Case 2:19-cv-00096   Document 18   Filed 03/10/22   Page 22 of 23 PageID #: 1448

Petitioner may seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate Order will enter.

WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE